Filed 10/24/22  P. v. Peek CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>WILLIAM PEEK,<br><br>  Defendant and Appellant. | B310103<br><br>(Los Angeles County<br>Super. Ct. No. VA153767) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lee W. Tsao, Judge.  Affirmed.

Michelle T. LiVecchi-Raufi, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Ryan M. Smith, Deputy Attorney General, for Plaintiff and Respondent.

In April 2020, someone jumped the counter at a convenience store in Whittier, beat the store clerk, and stole cigarettes.  Within a week, someone jumped the counter at another store on the same street to steal cigarettes and cash, later returning to steal a bag of chips too.  A jury determined all three acts were committed by defendant and appellant William Peek (defendant) and convicted him of two counts of robbery and one count of petty theft.  We are asked to decide whether one of the robbery counts is supported by substantial evidence and whether any of the convictions can stand in light of asserted instructional error regarding the significance of a witness's certainty as to a person's identity.  We also consider whether the use of opaque face masks during defendant's trial—to reduce the risk of contracting COVID-19—violated his constitutional right to confront witnesses against him.

## I.  BACKGROUND

A.  *The Offense Conduct, as Established by the Evidence at Trial*

1.  *California Market robbery*

Madan Kiratirai (Kiratirai) testified he was working at California Market, a convenience store in Whittier, on the evening of April 2, 2020.  A man Kiratirai had seen before—and who had been banned from the store because "he had done some other things"—entered.  Kiratirai asked the man to leave and picked up a phone to call the police.  The man jumped over a counter and punched Kiratirai several times.  Kiratirai fell to the ground and the man kicked him.  The man took several packs of cigarettes and left the store.

When the prosecution asked Kiratirai whether his attacker was in the courtroom, Kiratirai responded, "Everybody wearing masks, so I can't say." The trial court followed up by asking Kiratirai whether he saw anyone in the courtroom resembling his attacker, "even though you're not sure because everyone is wearing a facial covering[.]" Kiratirai responded, "Yeah, I think so," and identified defendant. The trial court asked whether it would "help . . . if that person removed his mask." Kiratirai said yes, but gave no reply when defendant lowered his mask and the trial court asked whether that helped him identify his attacker. The prosecution asked whether Kiratirai was afraid of his attacker, and Kiratirai answered, "It could happen again, so I cannot say I'm safe, right." When the prosecution once again asked whether defendant robbed him, Kiratirai answered, "Well, I'm not—I'm still confused because that day was night and it is long time . . . so I cannot say, yes, this person, because it is long and face and lot of things change."

Surveillance video (and derivative still images) of the robbery did not provide a clear view of the perpetrator's face, but the jury was invited to compare tattoos on the perpetrator's arms to photos of defendant's tattoos taken following his arrest a week later. The prosecution aptly described the photos derived from the California Market surveillance video as "grainy," but it is possible to compare the size, shape, and locations of several tattoos, as well as the robber's hairline. Compared in that manner, the tattoos on the inside of the robber's right forearm and on his left upper arm are consistent with defendant's tattoos, even if the video image does not permit a conclusion that they are necessarily the same. The robber's hairline is also similar to defendant's.

3

## 2. 7-Eleven robbery and petty theft

Two days after the California Market robbery, defendant robbed a 7-Eleven located on the same street in Whittier. The store's owner, Jatinder Jhaj (Jhaj), testified that defendant was behaving "very erratically in the store" earlier in the day and he told defendant to leave or he would call the police. Defendant returned to the store some time later and an employee, Prakash Chaulagain (Chaulagain), who was aware of the earlier disturbance, asked him to leave. Defendant did not; instead he jumped over the counter, threw a cash register on the floor, and left with two packs of cigarettes and approximately $1,200. Chaulagain testified he did not resist because he was afraid.

Chaulagain was working a few days later on April 8, 2020, when defendant returned to the store and took a bag of chips without paying. Chaulagain called for Jhaj, who followed defendant and called the police.

Both Chaulagain and Jhaj identified defendant at trial, with Jhaj expressing "100 percent" confidence in his identification. Surveillance video from both incidents was also admitted in evidence, and the video from April 8, 2020, shows defendant wearing a plaid shirt and holding a bag of Doritos chips. Whittier Police Department detective Robert Wolfe testified defendant was arrested about 100 yards from the 7-Eleven and had a bag of Doritos. Defendant is wearing a plaid shirt in a booking photo taken on the day of his arrest.

## B. Verdict and Sentencing

The Los Angeles County District Attorney charged defendant in an information with two counts of second degree

4

robbery (Pen. Code,[1] § 211) and one count of petty theft (§ 484, subd. (a)). The information alleged defendant had sustained three prior serious or violent felony convictions within the meaning of the Three Strikes Law (§§ 667, subds. (b)-(i), 1170.12) and section 667, subdivision (a)(1).

The jury found defendant guilty on all three counts charged. At a subsequent hearing, the trial court found the allegations regarding defendant's prior convictions true and sentenced him to serve 27 years to life in prison: 25 years to life for the California Market robbery, a consecutive term of two years for the 7-Eleven robbery, and a concurrent term of six months for petty theft.

## II. DISCUSSION

Defendant contends there was insufficient evidence to establish he was the person who robbed California Market. Although the clerk, Kiratirai, offered only a tentative identification of defendant at trial, that is easily understood as reticence provoked by fear of defendant. Kiratirai's identification, the photographic evidence, and the many similarities between the California Market and 7-Eleven robberies are collectively substantial evidence supporting the jury's verdict.

Defendant also asks us to reverse all three convictions because the trial court gave an instruction (CALCRIM No. 315) that permitted jurors to consider the certainty of an eyewitness's identification and our Supreme Court has since directed the

---

[1] Undesignated statutory references that follow are to the Penal Code.

5

Judicial Council to reevaluate this instruction. (*People v. Lemcke* (2021) 11 Cal.5th 644, 647-648 (*Lemcke*).) Putting aside the question of whether defendant forfeited the issue by failing to request a modification to the instruction at trial, any error was harmless. Consideration of Kiratirai's *lack* of certainty could only have benefited defendant, and the verdict would have been the same, given the strength of other evidence, even if the jury never heard the 7-Eleven clerks' confidence in their identification.

Finally, as to defendant's contention that trial witnesses' use of face masks while testifying violated his constitutional right of confrontation, we follow several other cases holding the COVID-19 pandemic warranted such policies for trials held in 2020 and jurors were still able to adequately assess witness credibility without seeing a witness's mouth or lower part of the nose.

### A.  Substantial Evidence Supports the California Market Robbery Conviction

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the record "'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) Defendant does not dispute that the offense conduct described by Kiratirai at the California Market satisfies the elements of robbery; his claim is only that there was insufficient evidence to prove he was the perpetrator.

"Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact." (Evid. Code, § 411; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 ["Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the [substantial evidence] standard is sufficient to uphold the [challenged] finding"].) Defendant contends Kiratirai was "unable to identify [him] as the robber at any time prior to, or during the trial," but this is not correct. When asked whether he saw anyone who looked like the robber in the courtroom, Kiratirai answered, "Yeah, I think so," and indicated defendant was that person. Defendant's suggestion that this response was "vague and did not specify [defendant] as the person that Kiratirai was referencing" is not supported by the record.[2]

This is not to say, of course, that Kiratirai's identification of defendant was unqualified: Kiratirai could not say *for certain* defendant was the perpetrator. But "'it is not essential that a witness be free from doubt as to one's identity. He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime, and the want of positiveness goes only to the weight of the testimony.' [Citation.]" (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 522.) In determining the weight to assign to Kiratirai's identification of defendant, tentative or qualified as it was, the jury was required to consider

---

[2] After Kiratirai described the person's attire, the trial court confirmed the person's seating position and, after asking Kiratirai whether it would help if the person removed their mask, stated "[defendant] has removed his mask."

7

not only Kiratirai's testimony indicating he could not precisely recall the appearance of his assailant but also his admission that he was afraid to testify at all. (See *People v. Valdez* (2012) 55 Cal.4th 82, 135 [""Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness""].) The jury could have appropriately determined it would credit Kiratirai's identification while ascribing his reticence or expressed uncertainty to fear of retaliation.

Significantly, Kiratirai's identification was also bolstered by the surveillance video evidence. While that footage (or still photos created from the video footage) is insufficiently clear to precisely identify facial features or the intricacy of tattoos, it does permit a comparison of the size and location of the robber's tattoos and the robber's hairline to defendant's—and there are similarities in all respects. Defendant complains that Detective Wolfe did not make such a comparison on the witness stand, but he did not need to; the jury could properly make the comparison itself.[3] (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*) ["[B]ecause the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was [the] defendant"].) Defendant's contention that the jury could not have identified him as the person in the surveillance video because he was masked throughout the trial ignores the facts that defendant lowered his mask during Kiratirai's

---

[3] Defendant also calls attention to the prosecution's mention of "teeth marks" when discussing one of the tattoo photos and exhorting the jury to examine it closely even though the photo was not clear. Defendant does not explain why this reference is significant, and there was no objection to the reference in any event.

8

testimony and the jury viewed photos of defendant taken just one week after the California Market robbery.

In addition, defendant's identity as the California Market robber was further supported by similarities between that crime and the 7-Eleven robbery—for which there is strong evidence he was the perpetrator. (See, e.g., *People v. Scott* (2011) 52 Cal.4th 452, 473 ["The inference of identity need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together"]; *People v. Miller* (1990) 50 Cal.3d 954, 989 ["the likelihood of a particular group of geographically proximate crimes being unrelated diminishes as those crimes are found to share more and more common characteristics"].) The 7-Eleven robbery occurred two days after the California Market robbery, the stores are on the same street, and both robberies involved an apparently unarmed, undisguised person familiar to store personnel from previous incidents ignoring commands to leave, leaping over the counter, and stealing multiple packs of cigarettes.[4]

---

[4] Defendant reasonably contends that jumping a counter and stealing cigarettes are not sufficiently unusual in convenience store robberies to support identification (see *Leon*, *supra*, 61 Cal.4th at 598 ["the greatest similarity is required to prove identity"]), but these were not the only features the two robberies shared, as just enumerated. Defendant also suggests we should only consider those features pointed out by the prosecution in its closing argument, but that runs contrary to settled law. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126 ["It is elementary . . . that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury"].)

Especially when considered collectively, Kiratirai's testimony, the video evidence, and the similarities between the crimes are substantial evidence supporting the jury's determination that defendant committed the California Market robbery.

### B. *Any Instructional Error Was Harmless*

The trial court gave the jury an eyewitness testimony instruction patterned on CALCRIM No. 315. That instruction told the jury it should consider several questions in assessing whether an eyewitness gave truthful and accurate testimony, including, "How certain was the witness when he or she made an identification?" Defendant's trial counsel expressly approved of giving the jury this instruction (small wonder, given Kiratirai's expressed uncertainty).

After the jury's verdict, our Supreme Court decided *Lemcke, supra,* 11 Cal.5th 644. In that case, the court acknowledged its precedent had "repeatedly endorsed the use of instructions that direct the jury to consider an eyewitness's level of certainty when evaluating identification evidence." (*Id.* at 655.) But the court emphasized "there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.' [Citations]." (*Id.* at 647.) The *Lemcke* Court expressed concern that CALCRIM No. 315 "does nothing to disabuse jurors of the common misconception" that "a certain identification is more likely to be accurate." (*Id.* at 666.)

Despite the "risk that the . . . version of [CALCRIM No. 315 at issue] w[ould] prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy," *Lemcke* did not hold a defendant's due process rights

10

are violated whenever the certainty factor is included in an eyewitness identification instruction. (*Lemcke, supra,* 11 Cal.5th at 669.) To the contrary, the court determined on the facts presented that "listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did *not* render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id.* at 661, italics added.) Though the *Lemcke* court did not find instructional error on this ground, the court did opt to exercise its "supervisory powers" to "direct . . . trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point. [Citation.]"[5] (*Id.* at 669.)

Defendant's trial was held prior to our Supreme Court's supervisory pronouncement in *Lemcke,* but he contends inclusion of CALCRIM No. 315's certainty factor in the jury instructions in his case was error because "the instruction could not be used if the trial were held today." This argument lacks merit: If use of the certainty factor prior to *Lemcke* were grounds for reversal, the Supreme Court would not have affirmed the judgment in *Lemcke.* (*Lemcke, supra,* 11 Cal.5th at 661 ["While an enhanced or modified version of the certainty instruction might well be advisable . . . , that alone does not establish a due process violation"].)

---

[5] The Judicial Council revised CALCRIM No. 315 in March 2022. The certainty factor now includes a warning about the limitations of this consideration and several optional sub-factors.

11

Furthermore, even if it was error to instruct the jury with CALCRIM No. 315 as then formulated, the error was harmless under any standard of assessing prejudice. As defendant concedes, the 7-Eleven witnesses' confident identification of defendant was "supported by the 7-Eleven videos." And as *Lemcke* explains, the certainty factor would not have misled jurors to defendant's detriment with respect to Kiratirai's qualified identification. (*Lemcke, supra,* 11 Cal.5th at 669, fn. 19 ["The misleading effect we are concerned with here—that the jury is prompted to believe there is a strong correlation between certainty and accuracy despite empirical research showing just the opposite—is not present when a witness has expressed doubt regarding the identification"]; accord *People v. Sanchez* (2016) 63 Cal.4th 411, 462.)

### C. *The Use of Face Masks Did Not Violate the Confrontation Clause*

Defendant's trial was held in November 2020 during the ongoing COVID-19 pandemic. A general order issued by the presiding judge of the Los Angeles County Superior Court on October 13, 2020,[6] provided that "[a]ll persons entering any courthouse or courtroom shall wear a face mask over their nose and mouth at all times within public areas of the courthouse or courtroom" and that "[f]ace shields may not be used without a face mask except as required by a physician." The general order cited "federal, state and local public health guidelines," including

---

[6] This court granted defendant's request for judicial notice of general order 2020-GEN-016-02. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

an order by the local public health authority requiring all persons to wear "'a cloth face covering whenever there is or can be contact with others who are non-household members in both public and private places . . . .'"

Consistent with the general order, the trial court required all witnesses to wear a face mask unless an exemption applied. Defendant, joined by the prosecution, requested that witnesses be allowed to wear clear face shields in lieu of masks so the jury could "better assess the witness[es]' body language, facial expressions, and . . . credibility . . . ." The trial court cited the general order in denying the request, emphasizing masks were required "notwithstanding the fact that we . . . have plexiglass surrounding the witness stand" and indicating that jurors would be "able to evaluate a witness'[s] credibility" because they could "still see the upper portion of the witness'[s] face."[7]

Defendant contends the trial court's enforcement of the masking order violated his constitutional right to confrontation. "The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Maryland v. Craig* (1990) 497 U.S. 836, 844 (*Craig*).) This right "includes not only a 'personal examination'" of witnesses, "but

---

[7] The trial court also denied defendant's motion for a new trial based on the mask requirement. The trial court again emphasized that the presiding judge "had made clear that . . . a facial shield was insufficient to protect the public" and "[t]he court and the jury were able to assess the credibility of the witnesses, notwithstanding the fact that they had facial masks on."

also '(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.' [Citation.]" (*Id.* at 845-846.)

"Although the constitutional right of confrontation is important, it is not absolute." (*People v. Wilson* (2021) 11 Cal.5th 259, 290.) Rather, it "'must occasionally give way to considerations of public policy and the necessities of the case.'" (*Craig, supra*, 497 U.S. at 848, quoting *Mattox v. United States* (1895) 156 U.S. 237, 243.) This "does not, of course, mean that it may easily be dispensed with," and the high court has emphasized "that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." (*Id.* at 850.)

California courts have published several opinions addressing the Confrontation Clause implications of witnesses wearing opaque face masks while testifying. The opinions are unanimous in holding that masking requirements for witnesses in trials held around the time of defendant's trial were necessary to protect those in the courtroom and the broader community. (*People v. Edwards* (2022) 76 Cal.App.5th 523, 525-526 (*Edwards*) [trial held in October and November 2020]; *People v. Lopez* (2022) 75 Cal.App.5th 227, 230, 233 (*Lopez*) [trial held in

14

September 2020]; *People v. Alvarez* (2022) 75 Cal.App.5th 28, 36 (*Alvarez*) ["there is no doubt that requiring people to wear masks covering the mouth and the lower part of the nose while testifying in the courtroom during the COVID-19 pandemic served an important state interest in protecting the public from a contagious, and too often, lethal, disease"]; *id.* at 38, fn. 7 ["nearly every state and federal court to consider the issue during our current COVID-19 pandemic has found no confrontation violation because a witness was wearing a mask"].) The opinions are likewise unanimous in holding that masking the lower part of the face does not materially undermine the jury's ability to assess credibility. (*Edwards*, *supra*, at 527; *Lopez*, *supra*, at 234 ["The jurors could see the witnesses' eyes, hear the tone of their voices, and assess their overall body language"]; *Alvarez*, *supra*, at 38 ["Although face masks covered the witnesses' mouths and the lower part of their noses, significant aspects of their appearance, including the eyes, tops of the cheeks, and the body, were readily observable as was posture, tone of voice, cadence and numerous other aspects of demeanor"].) The result reached in these opinions is, in our view, correct, and we reach the same conclusion here.

Defendant nonetheless contends the trial court should have disregarded the general order because, in combination with other COVID-19 policies and infrastructure,[8] "the use of a clear face

---

[8] The trial court told the jury about various safety measures the court had taken, including "requiring all persons inside the courthouse to wear a facial mask, to maintain social distancing of at least six feet inside the courtroom and all public areas," installing "plexiglass at various points in the courtroom to reduce the spread of droplets," providing hand sanitizer, "replac[ing] air

shield was a reasonable alternative to the non-clear face masks" for testifying witnesses. This specific argument has been rejected by precedent too, and we reject it for the same reasons. (*Edwards, supra*, 76 Cal.App.5th at 527 [argument that the trial court "could have ordered 'clear masks' or use of 'a face shield with a cloth drape along the bottom'" was not supported by "evidence an objective authority appraised these alternatives to be effective in combatting the disease's spread"].)

---

filters throughout the courthouse," and performing "enhanced cleaning twice a day."

## DISPOSITION

The judgment is affirmed.


### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



RUBIN, P. J.



KIM, J.